# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARTY THOMAS #331672,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:19-cv-00817 |
| | ) | |
| **CORE CIVIC, et al.,** | ) | JUDGE CAMPBELL |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

Marty Thomas, an inmate of the Trousdale Turner Correctional Center (TTCC) in Hartsville, Tennessee, has filed a pro se complaint for alleged violation of his civil rights pursuant to 42 U.S.C. § 1983. (Doc. No. 1.) The complaint is before the Court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and 42 U.S.C. § 1997e.

### I. STANDARD OF REVIEW

Under the PLRA, the Court must conduct an initial review of any civil complaint filed in forma pauperis, 28 U.S.C. § 1915(e)(2), or brought by a prisoner-plaintiff against government entities or officials, 28 U.S.C. § 1915A, or challenging the conditions of confinement, 42 U.S.C. § 1997e(c). Upon conducting this review, the Court must dismiss the complaint, or any portion thereof, that fails to state a claim upon which relief can be granted, is frivolous, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Sixth Circuit has confirmed that the dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "governs dismissals for failure to state a claim under those statutes because

the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). Thus, to survive scrutiny on initial review, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

In reviewing the complaint to determine whether it states a plausible claim, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). A pro se pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Pro se status, however, does not exempt a plaintiff from compliance with relevant rules of procedural and substantive law. *See Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989) ("Neither [the Supreme] Court nor other courts . . . have been willing to abrogate basic pleading essentials in pro se suits."); *see also Brown v. Matauszak*, 415 F. App'x 608, 612–13 (6th Cir. Jan. 31, 2011) (affirming dismissal of pro se complaint for failure to comply with "unique pleading requirements" and stating, "a court cannot create a claim which [a plaintiff] has not spelled out in his pleading") (citation and internal quotation marks omitted).

## II. FACTUAL ALLEGATIONS

Plaintiff alleges that on August 11, 2019, four or five gang members came to his cell at TTCC and held a knife to the throat of Steven Oatsvall, Plaintiff's cellmate, accusing Oatsvall of reporting some misdeed by their "homie." (Doc. No. 1 at 4.) Plaintiff verbally defended Oatsvall. (*Id.*) Two of the gang members then turned and physically attacked Plaintiff and held two knives to his throat. (*Id.* at 4–5.) The assault left Plaintiff with a swollen left eye, a knot on his lower back, and pain in his lower back that is a ten out of ten most days. (*Id.* at 5.) Plaintiff alleges that he requested medical attention on August 13, August 15, August 19, and September 4, but was never seen, despite personally handing a sick call request to the pod nurse on September 4. (*Id.* at 9.)

During the August 11 incident, the gang members accused Plaintiff of having killed a gang member "on the streets," and asked "what do you think his brother hood would do if we told them who you are and where you're at?" (*Id.* at 5.) They also referred to physical assaults Plaintiff allegedly suffered at other prisons in the past and said "you were told not [to] come here in the 1st place." (*Id.*) The gang members then stole several items of Plaintiff's property and demanded money from him and Oatsvall "to keep quiet" about Plaintiff. (*Id.*) When Plaintiff and Oatsvall responded that they did not have any money, the gang members suggested that Plaintiff earn the money through prostitution, "or you can die." (*Id.*)

Later that day, when the correctional officers working the unit came around for count, Plaintiff and Oatsvall told the officers and "female officer Rodriguez" that they needed to be placed in protective custody. (*Id.* at 5.) Plaintiff alleges that this request was ignored and that "no Lt., captain, warden, [or] unit manager" came to speak with the inmates. He alleges that he and Oatsvall spoke with an Officer Lewis on second shift on August 11 and 12 about "what was

3

going on," and Officer Lewis said he would inform the sergeant. (*Id.*) Plaintiff also pushed the emergency button in his cell multiple times on August 11 and 12, "informing whoever answered what was happening" and asking to speak to someone about protective custody. (*Id.* at 6.) He says those requests were ignored. (*Id.*) Plaintiff told Sergeant McCarty during the 4 p.m. count on August 12 that he and Oatsvall needed protective custody and why. (*Id.*) She responded that was the first she had heard about it and that she would talk to somebody and get back to him. (*Id.*) At the 9 p.m. count on August 12, Plaintiff and Oatsvall asked Officer Lewis for protective custody. (*Id.*) Lewis responded that "the sergeant and Lt. said" that "protective custody was filled to the brim," but he would ask the sergeant to come talk to them. (*Id.*) At approximately 9:15 p.m., Sergeant McCarty told Plaintiff and Oatsvall that the captain said "segregation is full [but] that they would try & clean some people out of segregation" and move Plaintiff and Oatsvall there the next day. (*Id.*) In the meantime, she told them that the safest thing for them was to stay locked down in their cell and to tell correctional officers not to open their door. (*Id.*) Plaintiff alleges that he and Oatsvall were still not safe under those conditions, as their "cell door was continuously opened" by the officer on duty, and he and Oatsvall would have to jump up and shut it. (*Id.*)

On August 13, 2019, while they were still in the same cell together, Plaintiff and Oatsvall received a threatening and sexually suggestive note slipped under their cell door. (Doc. No. 1 at 7.) Plaintiff showed the note to Officer Lewis that evening and asked to speak to the captain. (*Id.*) Officer Lewis said he would report the matter to the captain. When a lieutenant and a female officer came by to conduct count and check doors later that night, Plaintiff told them he had been requesting protective custody since August 11 and showed them the note. (*Id.* at 7–8.) They responded "Get with Unit Manager Perkins in the morning, there's another one scared to be

4

here, that's why we're checking doors." (*Id.* at 8). Oatsvall then pushed the emergency button in their cell and told the person who answered that they had "a PREA issue,"[1] but there was no further response. (*Id.*) On August 15, Plaintiff showed the note to Sergeant Ross, who finally took the note and gave it to Unit Manager Perkins. (*Id.*)

Plaintiff and Oatsvall received or found two more sexually threatening notes in their cell on August 17 and August 23, but his "complaints fell on deaf ears from 8/11/2019 until 8/23/2019." (*Id.* at 8.) Plaintiff alleges that even after TTCC's Facilities Investigator Ms. Nelson interviewed Plaintiff on August 19, no action was taken on his complaints until Oatsvall's son contacted TTCC and "an outside agency." (*Id.*) After that, Unit Manager Perkins took Plaintiff and Oatsvall at around 10 a.m. on August 23, one at a time, to an office to talk by speaker phone to a "very professional" Unit Manager Smith, and Plaintiff "described the events from 8/11/2019 to 8/23/2019." (*Id.* at 8–9.)

At approximately 4:25 p.m. on August 23, Perkins took Plaintiff and Oatsvall to medical "to have an anatominicall." (*Id.* at 9.) They were left in a waiting room that was "extremely dirty," with a restroom that was "extremely nasty" with human feces on the floor, wall, sink, and toilet and odor "so bad you had to hold your breath." (*Id.*) Plaintiff and Oatsvall had to eat supper in the dirty waiting room. (*Id.*) Then around 6 or 6:15 p.m., Perkins took Plaintiff and Oatsvall to cell in a different building "pending protective custody investigation." (*Id.*) Plaintiff describes the conditions in that cell as follows:

> For exercising Plaintiff's constitutional rights to be protected and requesting protective custody, Plaintiff was . . . placed in a cell that was extremely nasty, smelled like hot human urine with urine on the walls, the toilet still smells, and there was no air in the cell from 8/23/2019 until 9/5/2019. And the cell for all purposes is a punitive cell meant for punishment purposes. There's no table, no

---

[1] PREA is the commonly used acronym for the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 et seq.

5

> chairs or stools, the overhead light burns 24/7. Plaintiff Thomas isn't allowed to order food items from commissary. Thus, for exercising his constitutionally protected right to personal safety. In addition, Plaintiff's food trays for the whole week of September 1st and the week of August on the days of 8/27/2019, 8/29/2019, and 8/31/2019 was cold. In addition, Plaintiff has been denied any cleaning supplies to clean his cell since 8/23/2019 to 9/ /2019.

(*Id.* at 9.)

Plaintiff attributes the August 11 incident to inadequate procedures on the part of Core Civic at TTCC and a "policy, custom and practice" of inadequate funding and training of employees. (Doc. No. 1 at 12.) He alleges that Core Civic and TTCC "do not segregate dangerous inmates from vulnerable inmates, or from each other," and that the prison is so "grossly understaffed" that there is "only one correctional officer on duty to supervise and control the 120 or more inmates in a unit." (*Id.* at 11.) He alleges that inmates who threaten or attack other inmates are not isolated or properly disciplined and that Core Civic and TTCC do not provide adequate staff or properly train staff to supervise or discipline inmates or to respond to violence or requests for protective custody. (*Id.*) Core Civic and TTCC "have failed to implement adequate weapon control policies" and do not conduct regular searches for weapons like the ones used in the August 11 incident. (*Id.*) Plaintiff alleges that those failures have led to a "substantial risk of serious harm to inmates" at TTCC that is "longstanding, pervasive, and apparent to any knowledgeable observer" and that Core Civic and TTCC had actual knowledge of that risk since at least December 2018. (*Id.* at 11–12.)

Plaintiff claims that the facts alleged constitute deliberate indifference to his safety and his medical needs in violation of the Eighth Amendment. (Doc. No. 1 at 1, 10–13.) He sues Core Civic, TTCC Warden Russell Washburn, Tennessee Department of Correction (TDOC) Contract Monitor Chris Brun, Chief of Security Rubenard Risper, Chief of Unit Management Shane Cosby, Core Civic Correctional Administrator John Fisher, Unit Manager Perkins, Sergeant

McCarty, Sergeant Davis, Officer Rodriguez, Officer Holly, and several unknown correctional and medical personnel, all "individually and in their official capacities." (*Id.* at 1–4.) He seeks compensatory and punitive damages totaling $30,000 from each Defendant, as well as declaratory and injunctive relief. (*Id.* at 14–15.)

### III. ANALYSIS

#### A. General Section 1983 Standards

The plaintiff sues under 42 U.S.C. § 1983 to vindicate alleged violations of his federal constitutional rights. Section 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F. 3d 584, 590 (6th Cir. 2003) (citations omitted); 42 U.S.C. § 1983.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Thus the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes several minimal requirements on prison officials, such that they "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).

Regardless of which of the Eighth Amendment's minimal requirements is at issue, every deliberate indifference claim under the Eighth Amendment has both an objective and subjective

component. Objectively, an inmate must demonstrate "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. And subjectively, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Plaintiff claims that Defendants violated his Eighth Amendment rights with respect to his medical needs and his safety.

**B.     Deliberate Indifference to Medical Needs**

A "serious medical need" sufficient to satisfy the objective component of the deliberate-indifference test is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013). The injuries Plaintiff describes, including continuing severe back pain, are sufficient to satisfy the objective standard. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154–55 (6th Cir. 1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir. 1997) (holding that "substantial back pain" is a serious medical need).

But Plaintiff does not allege facts sufficient to demonstrate that anyone knew of and disregarded his serious medical needs. The subjective component of a medical deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). To establish the subjective component of this alleged

violation, a prisoner must plead facts showing that "prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). A defendant's state of mind is sufficiently culpable to satisfy the subjective component of an Eighth Amendment claim when it amounts to a reckless disregard of a substantial risk of serious harm; behavior that is merely negligent will not suffice. *Farmer*, 511 U.S. at 835-36.

Here, Plaintiff alleges that he "requested medical attention" on August 13, August 15, and August 19, but does not say how he made those requests or to whom, nor does he allege what reason he gave for requiring attention. He affirmatively acknowledges that he was taken to medical on August 23 for "an anatominicall," but does not provide any detail about what type of examination or consultation that entailed or why it did not sufficiently address his needs. He alleges that he "personally handed the nurse in AA Unit/pod a sick call request" on September 4, but—again—he does not say what he wrote in the request, what he said to the nurse when he delivered it, or what the nurse's response was.

In the absence of any allegations about whether his need for medical treatment was plainly visible to or otherwise explained to the unnamed nurse or any other individual, the complaint does not support any subjectively culpable state of mind. Plaintiff's claim regarding his medical needs will, therefore, be dismissed without prejudice.

C.  **Deliberate Indifference to Safety**

It is well established that prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832, 833 (1994). However, "[a] prison official's duty . . . is to ensure 'reasonable safety,'"

9

not absolute safety. *Id.* at 844 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). A prison official may only be held liable for acting with "deliberate indifference" to inmate safety, which, as explained above, requires proof that the official knew that the inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Id.* at 834.

In this case, Plaintiff does not allege that anyone, including himself, had any prior reason to know that the inmates who attacked him on August 11 posed any particularized threat to him. But the Sixth Circuit has explained that, while a "plaintiff might demonstrate that he was subject to a substantial risk of serious harm because he was subject to a specific risk of harm," he "cannot be required to" make that showing. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 815 n.12 (6th Cir. 1996). The Sixth Circuit based this rationale on the Supreme Court's holding in *Farmer*:

> To the extent that [circuit precedent] allowed a plaintiff to prove an Eighth Amendment violation by means of showing a "pervasive risk of harm," it is consistent with *Farmer*'s requirement of a showing of a "substantial risk of serious harm":
>
>> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Street*, 102 F.3d at 815 (quoting *Farmer*, 511 U.S. at 842–43). Accordingly, "[t]he failure to segregate violent inmates from non-violent inmates has been held to constitute 'deliberate indifference' where there is a pervasive risk of harm," *Dearing v. Bobby*, No. 4:13CV1500, 2013 WL 5466753, at *3 (N.D. Ohio Sept. 30, 2013) (citing *Street*, 102 F.3d at 814), and "several

federal courts of appeals . . . have determined that cell assignment policies that do not attempt to segregate violent prisoners from non-violent prisoners, particularly when combined with other aggravating factors, may be part of an Eighth Amendment violation." *Coleman v. Wetzel*, No. 1:15-CV-00847, 2016 WL 8252571, at *6 (M.D. Pa. Dec. 16, 2016), *report and recommendation adopted*, No. 1:15-CV-847, 2017 WL 551923 (M.D. Pa. Feb. 10, 2017) (collecting cases and denying qualified immunity to defendants).

Because Plaintiff alleges that he faced a pervasive, substantial, and readily apparent risk, and that he has suffered physical and emotional harm as a result, he states a colorable claim for deliberate indifference to his safety. The only remaining question is which Defendants he successfully states that claim against. Plaintiff attributes the pervasive danger to a number of policies or practices that exist a TTCC, including understaffing, lack of training, failure to segregate dangerous inmates, and failure to conduct adequate searches for weapons. He therefore states a colorable claim against Core Civic, which he identifies as the private prison management corporation charged with overseeing the operation of TTCC. *See Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003) (explaining that an inmate states a claim against a corporation performing traditional state functions when he alleges that his injury was caused by an action taken pursuant to some corporate policy or custom).

Plaintiff's claims against all other Defendants in their official capacities, however, will be dismissed. To the extent the named Defendants are employed by Core Civic, the claims against them in their official capacities are redundant to the claim against Core Civic itself. *See* Fed. R. Civ. P. 12(f) (authorizing courts to strike any "redundant [or] immaterial" matter); *Jones v. Heyns*, No. 1:12-CV-1341, 2014 WL 1607621, at *3 (W.D. Mich. Apr. 22, 2014) (recognizing that "most cases dismissing redundant official capacity claims involve claims against both the

11

entity itself and employees of the entity"); *Galloway v. Swanson*, No. 5:09CV02834, 2012 WL 646074, at *8 (N.D. Ohio Feb. 28, 2012), *aff'd sub nom. Galloway v. Anuszkiewicz*, 518 F. App'x 330 (6th Cir. 2013) ("An official capacity claim against an employee of a private corporation is viewed as a claim against the corporate entity itself."). And a lawsuit against any TDOC employees in their official capacities is equivalent to a suit against the State of Tennessee, which is absolutely immune from any suit for damages under Section 1983. *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) ("An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."); *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (stating that Tennessee has not waived its Eleventh Amendment immunity from § 1983 suits).

Although Plaintiff's demand for injunctive relief might otherwise be proper against a TDOC official in his official capacity, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."), Plaintiff has not alleged facts that would establish any TDOC official's liability. He alleges that Defendant Chris Brun is the TDOC Contract Monitor and that he is "legally responsible" for overseeing Core Civic operations at TTCC and ensuring compliance with TDOC policy and state law. (Doc. No. 1 at 3.) But that alone does not state an official-capacity claim against a TDOC official. To state an official-capacity claim for injunctive relief against a state official under Section 1983, a plaintiff must show a direct causal link between the alleged constitutional violation and an official policy or custom adopted with "deliberate indifference" toward the constitutional rights of persons affected by the policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The Sixth Circuit has held that to

12

establish such a causal link, a plaintiff must "identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citing *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)). The custom or policy must be "the moving force" behind the deprivation of the plaintiff's rights. *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiff has not identified any state or TDOC policy or custom that resulted in a deprivation of the plaintiff's constitutional rights, and his official-capacity claim against Brun and any other TDOC official among his Defendants will be dismissed.

Turning to Plaintiff's claims against named Defendants in their individual capacities, the Court notes that Plaintiff never mentions most of the Defendants in his complaint beyond listing them as Defendants and describing their positions. The only exceptions to this failure are Plaintiff's allegations, summarized above, involving Unit Manager Perkins, Sergeant McCarty, and Officer Rodriguez. Determining whether those three Defendants' personal actions or inactions contributed to violating Plaintiff's constitutional rights warrants further briefing or factual development, so Plaintiff's claims against them in their individual capacities will survive initial screening. All the other individual Defendants, however, will be dismissed for Plaintiff's failure to allege their personal involvement in violating his constitutional rights. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (requiring personal involvement in violation for individual liability under § 1983).

## IV. CONCLUSION

For the reasons set forth above, the plaintiff arguably states a claim against Core Civic and against Defendants Perkins, McCarty, and Rodriguez in their individual capacities for deliberate indifference in violation of the Eighth Amendment, for which process shall issue. All other claims will be dismissed without prejudice. An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE